# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

AUSTIN C.,[1]

        Plaintiff,

vs.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

Case No. 22-CV-4036-KEM

**MEMORANDUM OPINION
AND ORDER**

---

Plaintiff Austin C. seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f, and for child disability (CD) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Claimant argues that the administrative law judge (ALJ) erred in relying on the opinions of non-examining state agency consultants, in discounting statements of Claimant and his mother regarding his ability to concentrate and interact with others, and in posing hypothetical questions to a vocational expert (VE). I **reverse** the Commissioner's decision and **remand** for further proceedings.

## I.    BACKGROUND[2]

Claimant suffers from autism, attention deficit hyperactivity disorder (ADHD),

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 13).

and anxiety. AR 15. He previously received CD benefits starting when he turned 18 in October 2017 and continuing until he graduated high school in May 2018. AR 12, 383. He received mostly As in school, taking a combination of special-education classes and regular classes accompanied by an aide. AR 56, 383.

In 2015 and 2016, while still in high school, Claimant worked part time as a dishwasher at a fast-food restaurant. AR 45-46, 252, 426. He was fired after getting into an altercation with another employee and hitting them. AR 45-46, 426. He explained at the ALJ hearing it was a "misunderstanding," he got angry and struck his coworker, they struck him back, he "got mad about it[,] and it was this whole long thing." AR 46.

Claimant began seeing Nurse Practitioner Jeannie Franklin (NP Franklin) for psychiatric medication management in December 2017. AR 426. He changed care from another provider because his psychiatrist had been unable to see him earlier than a months-out scheduled appointment or adjust his medications in the meantime. AR 347, 426. Claimant also indicated at the time that he planned to attend college in Sioux City and wished to establish care with someone located in that city (like NP Franklin). *See* AR 348.

In July 2018, Claimant told NP Franklin that he planned to take college courses online. AR 406. He said that he wanted to be a psychiatrist. *Id.* When NP Franklin questioned whether this was a realistic goal for him given his temper, Claimant assured her that he was good at remaining calm and dealing with agitated people. *Id.*

In fall 2018, Claimant neither attended college nor worked. AR 403. He continued living at home with his mother. *Id.* In July 2019, he began working part-time as a janitor at a gas station, three-hour shifts five days a week. AR 37, 246, 392-93. He worked there through October 2019, until his manager "phased [him] out," giving him less and less hours until he was not scheduled to come in at all. AR 46, 246, 385. When a new manager took over in April 2020, Claimant began being scheduled to work again, and he continued to work at the gas station through the time of the ALJ hearing in July

2

2021. AR 46-47, 246. At the time of the hearing, he was working four-hour shifts five days a week; he said he had negotiated the increase in hours (and would like to work more if his boss would allow it). AR 37. He indicated that every time he was at work, he took out the trash and refilled the windshield wiper fluid; and that his boss will then assign him other tasks, which may include sweeping, spraying chemicals to clean up gas spills, stocking the cooler, or cleaning bathrooms. AR 36, 45. Claimant testified that he does not really have to interact with people at his job, noting that he might talk to new people and say hello, but they never worked there for long. AR 41-42, 47.

Claimant filed the current applications for SSI benefits on April 27, 2020, and for CD benefits on May 21, 2020, alleging disability since the day he was born. AR 12. The Social Security Administration denied Claimant's applications on initial review in July 2020, and on reconsideration in December 2020. AR 71, 78, 97, 98. In connection with those reviews, state agency consultants Scott Shafer, PhD, and Mark Becker, PhD, reviewed treatment notes and forms Claimant and his family completed for the Social Security Administration and issued opinions on Claimant's mental residual functional capacity (RFC).[3] AR 68-70, 84-86.

Claimant requested review before an ALJ. In January 2021, "medical consultant" Janet Telford-Tyler, PhD, "reviewed" the state agency consultants' RFC determinations and completed a form checking that she "agreed" with their determinations in all four mental RFC categories (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself). AR 473-76. It is unclear what, if any, information she reviewed in making this determination.

The ALJ held an administrative hearing by telephone on July 28, 2021. AR 12. Claimant, his mother, and a VE testified. AR 28-29. On August 13, 2021, the ALJ

---

[3] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)**).

issued an unfavorable decision, following the familiar five-step process outlined in the regulations[4] to determine Claimant was not disabled. AR 12-22. The ALJ determined the relevant time period was June 1, 2018, through the date of the decision, based on Claimant's prior receipt of CD benefits. AR 12-13. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since June 1, 2018, because his earnings fell below the relevant thresholds. AR 15. At step two, the ALJ found Claimant suffered from the following severe impairments: autism, ADHD, and anxiety disorder. AR 15. At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. AR 16. To aid in the evaluation of whether jobs existed that Claimant could perform (at steps four and five), the ALJ determined he had the following RFC:

> [Claimant can] perform a full range of work at all exertional levels but with the following non-exertional limitations: He is limited to the performance of simple, routine, repetitive tasks and instructions (SVP 1 and 2 jobs). He can have no contact with the general public and only occasional contact with coworkers.

AR 17. The ALJ explained:

> There is no dispute that [Claimant] should be precluded from detailed or complex tasks due to concentration difficulties and a low frustration tolerance. It is also reasonable to limit social interaction because of the reports of anger issues and social anxiety. However, the evidence of

---

[4] "The definition of disability for [CD benefit] cases is the same as for Disability Insurance Benefit . . . cases." **Program Operations Manual System (POMS) § RS 203.080(A)(2)**. "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

record, taken as a whole, simply does not indicate that the claimant would
be unable to perform simple work with reduced social demands.

AR 20 (citations omitted). In assessing RFC, the ALJ considered the RFC formulated
by the state agency psychological consultants and Dr. Telford-Tyler, as well as treatment
records and Claimant's activities of daily living. AR 18-21. The record does not contain
any medical opinions from a provider who actually examined Claimant, however.

Relying on a VE's testimony, the ALJ found a significant number of jobs existed
in the national economy that Claimant could perform, such as industrial cleaner, hand
packager, and stores laborer. AR 21-22. Accordingly, the ALJ concluded that Claimant
was not disabled from June 1, 2018, through August 13, 2021. AR 22.

Claimant appealed. The Appeals Council denied his request for review on May
23, 2022 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.[5]
Claimant filed a timely complaint in this court seeking judicial review of the
Commissioner's decision (Docs. 1, 4).[6] The parties briefed the issues (Docs. 13-16) and
consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 11).

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence
in the record as a whole."[7] "Substantial evidence is less than a preponderance, but
enough that a reasonable mind might accept it as adequate to support a decision."[8] The

---

[5] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[6] *See* **20 C.F.R. § 422.210(c)**.

[7] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[8] *Kirby*, 500 F.3d at 707.

court "do[es] not reweigh the evidence or review the factual record de novo."[9] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[10]

Claimant argues that the ALJ erred in relying on the opinions of non-examining state agency consultants. He also argues that substantial evidence does not support the ALJ's findings related to his limitations in concentrating and interacting with others, as the ALJ erred in evaluating his subjective complaints and information from his family members. Finally, Claimant argues that the hypothetical the ALJ posed to the VE was insufficient.[11]

### A. Medical Opinion Evidence

For claims filed after March 2017 (like Claimant's), the ALJ "evaluate[s] the persuasiveness of medical opinions" considering the following factors: (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is by a specialist; and (5) "other factors that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding

---

[9] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[10] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

[11] The Commissioner defends the ALJ's step-three finding, despite recognizing that Claimant "makes no explicit argument that he meets a listing." Doc. 15 at 6. I decline to address arguments not raised by Claimant.

of [the Social Security Administration's] policies and evidentiary requirements."[12] The first two factors, supportability and consistency, are the most important.[13] The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[14]

Claimant argues that the ALJ erred in relying on the medical opinions of the state agency consultants over his treating provider, NP Franklin. But as the Commissioner points out, NP Franklin did not submit a medical opinion or otherwise opine as to Claimant's functional limitations.[15] Claimant points to NP Franklin's treatment records containing her diagnoses and the results of her mental status examinations, but these are not "medical opinions" that the ALJ must evaluate and explain the persuasiveness of.

---

[12] **20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c)**.

[13] **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

[14] **20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2)**.

[15] The regulations define "medical opinion" as follows:

> [A] statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [the claimant] ha[s] one or more impairment-related limitations or restrictions in the following abilities:
>> (i) . . . perform[ing] physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>> (ii) . . . perform[ing] mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>> (iii) . . . perform[ing] other demands of work, such as seeing, hearing, or using other senses; and
>> (iv) . . . . adapt[ing] to environmental conditions, such as temperature extremes or fumes.

**20 C.F.R. § 404.1513(a)(2);** *accord* **20 C.F.R. § 416.913(a)(2)(i)**.

7

Claimant also argues that the lack of opinion evidence from an examining medical source renders the ALJ's RFC determination unsupported by substantial evidence. When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.[16] The ALJ's RFC determination must be supported by at least some medical evidence from a medical professional that "addresses the claimant's ability to function in the workplace."[17]

Here, the only medical opinions in the record are from the state agency consultants and Dr. Telford-Tyler, who reviewed the treatment notes and other evidence of record, but did not examine Claimant. Claimant relies on *Nevland v. Apfel*, in which the Eighth Circuit held that "the ALJ should have sought . . . an opinion from [claimant's] treating physicians or, in the alternative, ordered consultative examinations," rather than "rel[y] on the opinions of non-treating, non-examining physicians . . . to form an opinion of [claimant's] RFC" when numerous treatment notes "establishe[d] that [claimant] suffer[ed] from . . . impairments which prevent him from performing his past relevant work" but not how those impairments "affect his [RFC] to do other work."[18] Thus, district courts have held *Nevland* does not require remand when "other medical evidence in the record"—such as treatment notes—"clearly establishes a claimant's RFC to do other work[] and to function in the workplace."[19] "The ultimate question . . . is whether

---

[16] ***McKinney v. Apfel***, 228 F.3d 860, 863 (8th Cir. 2000).

[17] ***Hutsell v. Massanari***, 259 F.3d 707, 712 (8th Cir. 2001) (quoting ***Lauer v. Apfel***, 245 F.3d 700, 704 (8th Cir. 2001)).

[18] 204 F.3d 853, 857-58 (8th Cir. 2000).

[19] ***Kruger v. Colvin***, No. C13-3036-MWB, 2014 WL 1584411, at *10 (N.D. Iowa Apr. 21, 2014), *report and recommendation adopted by* 2014 WL 2884038 (June 25, 2014); *see also* ***Becherer v. Colvin***, No. 4:12CV2356 ACL, 2014 WL 4230906, at *13 (E.D. Mo. Aug. 26, 2014) (noting that the claimant in *Nevland* "provided medical evidence that documented his limited functional capabilities" and holding that remand is not required when "no medical

a critical issue was underdeveloped . . . such that the ALJ's decision was not supported by substantial evidence."[20] This is consistent with Eighth Circuit cases holding that "some medical evidence" may consist of medical opinions by nonexamining state agency consultants, as long as those opinions are consistent with the treatment notes and other evidence of record.[21]

The state agency consultants recognized that Claimant suffered moderate limitations in memory, concentration, and adapting to change, but they opined he "retain[ed] the ability to understand, remember, and follow at least noncomplex

---

evidence in the record support[s] any greater limitations than those found by the ALJ"); *Symens v. Colvin*, No. CIV 13-3006-RAL, 2014 WL 843260, at *26 (D.S.D. Mar. 4, 2014) (holding that remand is not required under *Nevland* when "the ALJ engaged in an extensive review of the medical evidence. . . . [that] supported the ALJ's" RFC and "was also consistent with the reports from the" nonexamining state agency consultants); *Knight v. Astrue*, No. 12-06004-CV-SJ-NKL-SSA, 2012 WL 4092356, at *7 (W.D. Mo. Sept. 17, 2012) ("*Nevland* stands for the proposition that, where the claimant's alleged RFC is otherwise supported by substantial evidence in the record, the ALJ may not rely solely on the opinions of non-examining sources in rejecting the alleged RFC.").

[20] *Kruger*, 2014 WL 2884038, at *2; *see also* **20 C.F.R. §§ 404.1519a(b), 416.919a(b)** (Social Security Administration may purchase a consultative examination "to try to resolve an inconsistency in the evidence" or "when the evidence as a whole is insufficient" to resolve the claim).

[21] *Bowers v. Kijakazi*, 40 F.4th 872, 875-76 (8th Cir. 2022) (holding that ALJ did not err in relying on opinions of state agency physicians, who examined only the medical records and not the claimant, when their opinions that claimant could perform light work were more consistent with the objective medical evidence than the treating doctor's opinion; the objective medical evidence showed routine treatment every six months, mostly mild findings on imaging, and normal motor and neurological function); *Kamann v. Colvin*, 721 F.3d 945, 948-51 (8th Cir. 2013) (rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ rejected the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist"); *Anderson v. Shalala*, 51 F.3d 777, 779-80 (8th Cir. 1995) (holding that the ALJ's RFC determination was supported by substantial evidence when the ALJ relied on the opinions of two reviewing physicians; adopted some, but not all, of the limitations set forth by the treating physicians; and "conducted an independent analysis of the medical evidence").

9

instructions"; that "[h]is attention, concentration, and pace are adequate for noncomplex tasks not requiring consistent, intense concentration"; and that "[h]e can adjust to changes in the workplace with supervision." AR 67-70, 83-86. The ALJ found these opinions persuasive and limited Claimant "to the performance of simple, routine, repetitive tasks and instructions (SVP 1 and 2 jobs)." AR 17. The amount of time it takes the typical worker to learn a job is called the specific vocational preparation (SVP) level, and the Dictionary of Occupational Titles (DOT) lists each job's SVP level.[22] Jobs with an SVP level of 1 require a "short demonstration only," while jobs with an SVP level of 2 involve more than a "short demonstration up to and including 1 month." *Id.* Work with an SVP level of 1 or 2 constitutes "unskilled work."[23] By definition, unskilled work involves "simple duties that can be learned on the job in a short period of time" and requires "little or no judgment."[24] Guidance from the Social Security Administration further provides that "[t]he basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; and to deal with changes in a routine work setting."[25]

Here, the ALJ did not include any limitations in RFC related to adjusting to change—despite SVP level 1 and 2 work requiring the ability to deal with changes in a routine work setting. The state agency consultants imposed a change limitation, finding that Claimant could only adjust to change with supervision. AR 70, 86. Claimant and his sister indicated in function reports (completed for the Social Security Administration in July and October 2020) that he does not handle changes in routine well. AR 264, 285,

---

[22] **DOT, App. C**.

[23] *See **Hulsey v. Astrue***, 622 F.3d 917, 923 (8th Cir. 2010).

[24] **20 C.F.R. §§ 404.1568(a), 416.968(a)**.

[25] **Social Security Ruling (SSR) 85-15**, 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857, at *4 (Jan. 1, 1985).

296. His mother also testified at the ALJ hearing that Claimant does not accept change well, explaining that if she tries to get Claimant to leave the house with her, it ordinarily results in a big fight; that if she asks him to do a chore out of the ordinary, such as sweep or mop, it "does not go over well"; that Claimant refused to go into work the few times his supervisor asked him to work extra hours unexpectedly; and that Claimant's supervisor said if she "throws in something extra for [Claimant] to do," most of the time he does not complete the task and pouts about it. AR 54-55. In addition, Claimant indicated he wears the same clothes of only certain colors and textures; that he refuses to cut his hair; that he never learned how to handle money and does not want to learn; and that he does not drive because he "hate[s] being . . . pressured into doing" things and his "response to pressure is generally not to do the thing that [he is] pressured to do." AR 48, 260, 282. Claimant's resistance to change is consistent with his autism diagnosis: individuals with autism "may adhere to inflexible, nonfunctional rituals or routine" and "become upset with even trivial changes in their environment."[26]

The ALJ did not discuss Claimant's ability to adapt to change, nor explain why the ALJ failed to include such a limitation in his RFC. No medical opinions in the record support that Claimant can handle changes in the routine work setting without supervision, as suggested by the ALJ's RFC determination. Under the circumstances, "some medical evidence" does not support the ALJ's RFC determination.[27]

---

[26] *United States v. Spero*, 382 F.3d 803, 804 n.3 (8th Cir. 2004) (quoting *PDR Medical Dictionary* 171 (2d ed. 2000)); *see also* **Diagnostic & Statistical Manual of Mental Disorders**, Autism Spectrum Disorder (5th ed., revised 2022) (online database) (DSM-V) (diagnostic criteria for autism includes meeting two of four criteria, one of which is "[i]nsistence on sameness, inflexible adherence to routines, or ritualized patterns of verbal or nonverbal behavior (e.g., extreme distress as small changes, difficulties with transitions, rigid thinking patterns, greeting rituals, need to take same route or eat same food every day)").

[27] *See Peterson v. Colvin*, No. C14-4110-LTS, 2016 WL 1611480, at *11 (N.D. Iowa Apr. 21, 2016) (holding that no medical evidence supported the ALJ's RFC finding that the claimant could

11

As for Claimant's memory and concentration issues, the ALJ's limitation to simple, routine, repetitive work is consistent with the medical opinions of the state agency consultants. The record contains evidence that Claimant suffers some limitation in these areas. During a May 2020 interview with the Social Security Administration, Claimant knew his name, date and place of birth, mother's name, and where he works; but not his mother's maiden name, the amount he made per hour, or when he was paid. AR 248. He also "would all [of a] sudden just leave the room," and his mother "would have to get him back" on the phone. *Id.* At the ALJ hearing in July 2021, he did not know his Social Security number or phone number "off the top of [his] head," but he did know his address. AR 30. He also could not name many of the medications he took due "to their very weird names." AR 49. Treatment records from NP Franklin indicate that Claimant did not know his address or mother's phone number. *See* AR 388.

NP Franklin's treatment records (covering December 2017 to June 2021) reflect subjective reports of decreased short-term and long-term memory, getting easily distracted, and the inability to concentrate, although the records after July 2019 add that concentration is improved with medications.[28] In December 2017, NP Franklin noted Claimant "remembered 2 out of 3 items at 2 minutes, could spell the word world forward and backward, was abstract in his thinking and remembered the last 4 presidents." AR 428. As the ALJ recognized, NP Franklin's objective mental status examinations (from December 2017 to June 2021) reflect impaired attention, concentration, memory, problem solving, and "abstract thinking (questionable)"; as well as diminished fund of knowledge and a lack of appropriate vocabulary level after July 2019 (prior treatment

---

sit or stand for thirty minutes at a time when "no medical source or other source provided an opinion that [claimant] can sit or stand for more than 15 minutes at once").

[28] NP Franklin's notes on Claimant's subjective complaints appear at the following places in the record: AR 384, 388, 391, 394, 402, 404, 408, 410, 415, 418, 421, 426, 466, 469, 480, 486, 497.

notes reflect "appropriate" in these two categories).[29]  AR 19.[30]  The ALJ noted, however, that these abnormalities have "not been observed at all by the claimant's physical care provider."  AR 19.  But it appears that Claimant's physical provider only evaluated these categories once.  *See* AR 328 (note from February 2020 shows no impairment of recent or remote memory and appropriate fund of knowledge for purposes of evaluating neurological functioning); *see* AR 332, 335, 337, 340, 343, 345-46, 350, 352, 355, 357 (noting only normal orientation, cooperative, well groomed, and pleasant, which is not necessarily inconsistent with NP Franklin's examinations).  Similarly, the ALJ noted (when discussing the listings) that although "deficits in concentration and attention are noted throughout medical records, . . . there are no actual findings of distractibility, tangential thought processes, or flight of ideas."  AR 16.  But NP Franklin's treatment notes do not reflect that Claimant was *not* distracted or that he had normal thought processes.  *See, e.g.*, AR 388.  And under "thought processes/ cognitive function," NP Franklin routinely noted "attention deficit," as well as the other issues with memory and concentration noted above.  NP Franklin's objective examinations also routinely reflect "loose associations" under neurologic speech (but normal neuropsychiatric speech and liner, organized, and goal directed language).

The ALJ noted Claimant's conservative treatment.  AR 20.  The claimant saw NP Franklin for medication-management appointments every month from December 2017

---

[29] NP Franklin's objective examinations evaluate memory under "neurologic" and "thought processes/cognitive function."  Memory is listed as impaired both times in treatment notes through March 2019; later treatment notes reflect impaired long-term memory in the neurologic section but "no impairment of long term memory (perception of events is skewed)" in the "thought processes/cognitive function" section.  Similarly, the diminished fund of knowledge noted in treatment notes after July 2019 is in the "thought processes/cognitive function" section; the neurologic section reflects appropriate fund of knowledge.

[30] NP Franklin's objective examinations appear at the following places in the record:  AR 384, 388, 391, 394, 402, 405, 408, 410, 415, 418, 421, 427, 466, 469, 480, 486, 497.

through May 2018; and after that, he generally met with her every three to five months. Although NP Franklin often continued Claimant's medications, she also occasionally adjusted the medications or dosages. And as the ALJ recognized, NP Franklin's mental status examinations still reflected abnormalities, despite improvement with medications.

In determining Claimant could concentrate as necessary for simple work, the ALJ largely relied on his part-time job and ability to play video games for hours on end. AR 18-19. The ALJ noted Claimant "reported no difficulties completing his assigned duties" at work; Claimant's testimony that he would like to work more hours if given the opportunity; and "no evidence that he receives any accommodations or special assistance." AR 18. At the hearing, when the ALJ asked why Claimant could not perform his job full time, he noted the "lack of . . . other things . . . that I could do," suggesting that the limited number of tasks of which he was capable did not amount to full-time work. AR 38. Although the ALJ noted Claimant reported no issues completing his assigned duties, NP Franklin's objective examinations routinely reflect that Claimant lacks insight into his limitations (for example, Claimant believed he could become a psychiatrist despite his difficulties with people (AR 406)). And contrary to the ALJ's conclusion, there is some evidence that Claimant was treated differently than the normal employee, since his mother testified that his supervisor called her to report difficulties with Claimant (that Claimant was hiding in the bathroom rather than completing his tasks and that he "pouted" rather than finishing extra assignments). AR 47, 54. In addition, a former supervisor phased Claimant out by declining to schedule him for months. AR 46. The ALJ relied heavily on Claimant's part-time employment but failed to develop the record to determine if Claimant received accommodations or special assistance (the typical employer will not call the employee's parent to discuss behavioral problems).

The ALJ also found that Claimant's ability to play video games for ten hours "demonstrates that he is capable of focusing and concentrating on a task and sustaining that focus and concentration for an extended period of time." AR 19. The ability to play

14

video games, standing alone, does not support that Claimant's memory and concentration is sufficient to perform SVP level 1 and 2 jobs (which may require up to a month's worth of training).[31]

The evidence here supports that Claimant suffers limitations in memory and concentration, but not how those limitations "affect his ability to function in the workplace."[32] It is unclear whether Claimant is capable of performing SVP level 1 and 2 jobs, particularly given the evidence suggesting his part-time job might be performed under special circumstances (although that is unclear). Without information from Claimant's employer or a supporting medical opinion from a treating or examining source, the ALJ's RFC determination is not supported by some medical evidence. The ALJ should have obtained additional medical-opinion evidence from a treating or examining source.[33]

---

[31] *Cf.* **Taylor v. Colvin**, 829 F.3d 799, 801 (7th Cir. 2016) (suggesting that "playing video games" does not necessarily "require[] the same level of concentration as working full time").

[32] **Morris v. Colvin**, No. C14-4068-LTS, 2016 WL 3360506, at *10 (N.D. Iowa June 16, 2016).

[33] *See id.* at *10 (examining-source opinion required when "mental health treatment notes" from multiple years "reflect[ed] serious, 'uncontrolled' impairments with severe symptoms and in-patient psychiatric hospitalization," but provided no information of how the claimant's impairments "affect[ed] his ability to function in the workplace"); **Walker v. Colvin**, No. C 13-3021-MWB, 2014 WL 2884028, at *2 (N.D. Iowa June 25, 2014) (examining-source opinion required when treatment notes consisted of "terse summaries of individual treatment sessions that offer no guidance as to how [claimant's] migraines affect her life and everyday functioning"), *adopting report and recommendation*, 2014 WL 1348016, at *10 (Apr. 3, 2014) (noting that "the evidence d[id] suggest there may be some work-related limitations associated with [claimant's] migraines," as they occasionally lasted more than a day and required hospitalization and affected her activities of daily living); *cf.* **Smith v. Colvin**, No. C14-4076-LTS, 2016 WL 1248874, at *11 (N.D. Iowa Mar. 29, 2016) (examining-source opinion not required when treatment notes reflected that claimant occasionally reported right hand pain after carpal tunnel surgery, but sought little treatment and had normal physical examinations; and had normal objective examinations and did not seek treatment for knee after knee surgery); **Agan v. Astrue**, 922 F. Supp. 2d 730, 755-56 (N.D. Iowa 2013) (examining-source opinion not required when treatment notes reflected that only a lifting restriction was imposed immediately after back surgery, that claimant recovered well from surgery, and that medication controlled back pain).

15

The state agency consultants also opined that although Claimant suffers marked limitations in interacting with the public, he can "interact appropriately with coworkers and supervisors on a limited basis." AR 70. The ALJ limited Claimant to jobs with "no contact with the general public and only occasional contact with coworkers." AR 17.

The ALJ generally noted "reports of anger issues and social anxiety." AR 20. Claimant's testimony and function reports indicate that he largely stays in his room playing single-player video games; that the only friend he spends time with is a cousin who visits every few months; that he does not shop in stores or go out in public much; and that he needs a family member to drive him to work and accompany him to appointments. AR 40-41, 55, 57, 258, 261-62, 279-80, 282, 285. A treatment note from January 2018 notes that Claimant would not go into Walmart alone and required his mother to accompany him because "he does not like people." AR 422. A treatment note from March 2018 states Claimant "will not go into stores but isolates in his house much of the time." AR 416. NP Franklin's treatment notes continuously reflect subjective reports that Claimant is easily irritated and "gets angry at times and has an explosive temper" according to his mother. *See also* AR 485 (noting still agitated at times).

The ALJ recognized "incidents with [Claimant's] parents" but found them "not indicative of how [Claimant] might behave toward non-family members in the work setting." AR 20. Claimant stated at the hearing he is "pretty close with [his] sisters" but has the "fights you have with your siblings every now and again." AR 41. He also acknowledged arguing with his mother daily, explaining that they are "both very stubborn" and fight over "silly things, like . . . how something has to look or the cleanliness of the house or whether or not towels on the bathroom floor will cause ants or not." AR 47-48. His mother testified that Claimant "was not very nice to" her after she talked about his behavior with his attorney, that he does not get along with his sisters, and that he has pushed her down a few times when he did not like what she said. AR 53, 55; *see also* AR 264. His mother testified she sometimes had to call Claimant's

16

father to come help when she could not "handle him." AR 58. A treatment note from December 2017 reflects that Claimant became "very anxious" when his mother took his ability to play video games away, and his mother feared for her safety; Claimant denied he would ever physically assault his mother, but NP Franklin informed Claimant his mother did not know that. AR 427. A February 2018 treatment note states "patient does not want to be independent" and "will break the phone if his [mother] buys him one as he does not want to use a phone." AR 416. A May 2018 treatment note reflects that Claimant's mother reported he "continues to be argumentative" and they "got into an altercation" over a graduation party for Claimant; NP Franklin noted "part of this is personality." AR 409. A July 2019 treatment note reflects that NP Franklin told Claimant his mother had said he was "having much anger at home"; Claimant defended his anger as "justified," noting his mother made him "walk home one very hot day because he did not answer his phone." AR 395. An August 2019 treatment note reflects that Claimant was angry because his dad would not answer the phone when he needed a ride home from work and said he wanted to "slap his dad in the head really hard"; when NP Franklin told him he should not hurt anyone or he may end up in jail, Claimant said he doubted he would go to jail because his dad "is not that kind of person." AR 392. In May 2021, NP Franklin noted Claimant was not helping his mother as much as he could after she suffered an injury, and Claimant stated that the "disagreements with his mother are miscommunications." AR 487.

The ALJ found that Claimant could sustain occasional interaction with coworkers because Claimant's "interactions with medical personnel have been appropriate," and "he was well-spoken and handled himself well" at the telephonic hearing. AR 19-20. A treatment record from NP Franklin, however, reflects that in January 2018, when NP Franklin asked Claimant why he could not go into Walmart alone, he "gave [her] an intense stare" and appeared "somewhat agitated." AR 422. At the next appointment, NP Franklin told Claimant she had been "somewhat confrontative . . . to see how he

17

would react," and he "[c]learly . . . did become agitated and angry with confrontation." AR 419. She noted he tries "to be on his best behavior" at appointments, so she does not "actually see how bad his moods and anger get." *Id*. A July 2019 treatment note from NP Franklin also indicates that she "ma[de] an effort not to escalate the patient" when asking him about a confrontation with his mother. AR 395. And although Claimant may have handled himself well on the phone with the ALJ, the ALJ did not acknowledge the May 2020 telephonic interview with the Social Security Administration in which he repeatedly had to be wrangled by his mother. AR 248.

The ALJ also noted that Claimant had previously gotten "into an altercation" with a coworker in a prior job (NP Franklin's treatment records reflect that he was fired because "he hit someone" and that he "put cheese on someone[']s face at a job harshly"). AR 19-20, 426-27; *see also* AR 45-46, 55. The ALJ noted that Claimant testified "[h]e interacts as needed in his current job without any reported difficulties" and that he has not "become angry or aggressive with his work superiors in his current job." AR 20-21. As noted earlier, the record is rife with evidence that Claimant lacks insight into his limitations, so Claimant's testimony that he interacts appropriately with his current coworkers does not necessarily establish that fact. Claimant noted that he has little occasion to interact with others at his current job, as he mostly works by himself. *See* AR 41-42, 47. The ALJ did not obtain evidence from Claimant's employer regarding his social interactions, despite relying heavily on Claimant's part-time work in determining his RFC.

In addition, although the ALJ limited Claimant to no contact with the public, the ALJ found his part-time work showed he could interact with supervisors and coworkers on an "occasional" basis. AR 17. "Occasionally" is a term of art meaning "very little up to one-third of the time, and would generally total no more than about 2 hours of an

18

8-hour workday."[34]  It does not appear from Claimant's testimony that his current job requires "occasional" interaction with others.  In addition, the ALJ limited the total length of time that Claimant could interact with others, but not the quality of those interactions.  "[I]t is possible for a person to have occasional but lengthy and in-depth interactions with coworkers."[35]  Here, substantial evidence does not support that Claimant could sustain employment that ever required lengthy, in-depth interactions.

Substantial evidence does not support the ALJ's RFC determination.  The ALJ relied too heavily on Claimant's part-time employment without developing the record related to that employment.  And "some medical evidence" does not support the ALJ's RFC determination, given the evidence that Claimant suffers limitations in memory, concentration, and social interaction, and the lack of medical opinions from a treating or examining source in the record.  Remand is required for further development of the record.[36]

### B. Subjective Complaints and Third-Party Statements

When evaluating a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating

---

[34] *See, e.g.*, **Social Security Ruling (SSR) 96-9P**, 61 Fed. Reg. 34478, 34480 (July 2, 1996).

[35] ***Sanders v. Astrue***, No. CV 11-1356 (JNE/JJG), 2012 WL 1658988, at *2 (D. Minn. May 11, 2012).

[36] Claimant argues this case should be remanded for an award of benefits.  Remand for an award of benefits is appropriate "only if the record 'overwhelmingly supports'" a finding of disability, and the "ordinary practice is to remand 'out of . . . abundant deference to the ALJ.'"  ***Papesh v. Colvin***, 786 F.3d 1126, 1135 (8th Cir. 2015) (quoting ***Buckner v. Apfel***, 213 F.3d 1006, 1011 (8th Cir. 2000)).  I do not find remand for an award of benefits is appropriate in this case.

factors; and (5) functional restrictions."[37]  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[38]  The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary"[39] or "inconsistencies in the record as a whole."[40]  Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[41]

Claimant argues that the ALJ erred in evaluating his and his mother's testimony. Claimant argues that the ALJ relied too heavily on his ability to work part-time and should have included additional limitations in his RFC related to his ability to interact with people and his ability to concentrate, persist, and maintain pace.  For the reasons discussed in the preceding section, I agree that substantial evidence does not support the ALJ's RFC determination, particularly with respect to these categories.  Further development of the record is required.

---

[37] *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).

[38] *Black*, 143 F.3d at 386.

[39] *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

[40] *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993).

[41] *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)).

### C. VE Hypothetical

An ALJ bears the burden of proving there are jobs in the national economy the claimant can perform.[42] "In making this determination, the ALJ may rely on testimony by a VE that is 'based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'"[43] The hypothetical question must "precisely" describe the claimant's limitations.[44] When a hypothetical is based on an ALJ's RFC determination for a claimant, and that RFC determination is supported by the record, the ALJ can rely on testimony based on that hypothetical.[45] Put another way, "the ALJ may exclude any alleged impairments that [the ALJ] . . . properly rejected as untrue or unsubstantiated."[46] An ALJ does not err by failing to include additional limitations that are based on subjective complaints that the ALJ did not fully credit.[47] Thus, the ALJ's questions to the vocational expert need only reflect those limitations that the ALJ finds are applicable to claimant.[48]

In this case, the ALJ posed a hypothetical to the VE that assumed an individual of Claimant's age and education, with no exertional limitations, who is able to perform simple, repetitive, routine tasks (SVP 1 or 2 jobs) but have no contact with the general

---

[42] *See Gieseke v. Colvin*, 770 F.3d. 1186, 1189 (8th Cir. 2014); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

[43] *Gieseke*, 770 F.3d at 1189 (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007)).

[44] *See Newton v. Charter*, 92 F.3d 688, 694-95 (8th Cir. 1996).

[45] *Cox. v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006); *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (hypothetical that includes the limitations that the ALJ accepted as true is sufficient).

[46] *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)).

[47] *Harvey v. Barnhart*, 368 F.3d 1013, 1015-17 (8th Cir. 2004).

[48] *See Harwood v. Apfel*, 186 F.3d 1039, 1044 (8th Cir. 1999).

public and no more than occasional contact with coworkers. AR 61. That hypothetical is consistent with the ALJ's RFC findings. Accordingly, the VE hypothetical, standing alone, does not provide an independent basis for reversal.

### III. CONCLUSION

I **reverse** the Commissioner's decision. On remand, the Social Security Administration should include a limitation in Claimant's RFC related to his ability to adapt to change; obtain information from Claimant's part-time employer regarding his ability to perform that job; and obtain a medical opinion on Claimant's mental RFC from a treating or examining source.

**SO ORDERED** October 30, 2023.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

22